IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CASE NO. 4:05 CR 384 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE McHARGH |
| | ) | |
| JOHN EDWARD PROKOP, et al., | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendants. | ) | |

Defendants John Edward Prokop and Lisa Marie Tokarsky entered into plea agreements on April 28, 2006 in which they agreed to, among other things, pay restitution to the victims of their various investment schemes, ETS Payphones ("ETS"), JED Technologies, Inc. ("JED") ATM machines, Mutual Benefits Corporation ("MBC") viaticals, and American Benefits Services, Inc., ("ABS") viaticals.  On July 18, 2006, Judge Nugent referred this matter to the Magistrate Judge for a Report and Recommendation on the issue of the total amount of restitution owed by Defendants. Upon review of the restitution memorandums submitted by all parties, the Magistrate Judge concludes the total amount of restitution owed by Defendants is $15,501,629.69 less (1) any disbursements from an MBC and/or ABS viatical policy and/or any money from an MBC and/or ABS receiver; and (2) any future disbursements from the ABS receiver.

## I. LAW

### A. Applicable Statute

"Federal courts have no inherent power to order restitution.  Such authority must be conferred by Congress." *United States v. Helmsley*, 941 F.2d 71, 101 (2d Cir. 1991).  Congress has authorized such restitution through the Victim and Witness Protection Act ("VWPA") and the Mandatory Victims Restitution Act ("MVRA").  Where the VWPA allows a sentencing court to

impose an order of restitution when imposing sentences under Title 18, certain drug offenses and violations of transportation laws, the MVRA requires a sentencing court to order restitution against defendants convicted of specific, listed crimes in the full amount of their victims's actual losses. *See* 18 U.S.C. §§3663, 3663A.  However, conviction of one of the listed crimes is not required to warrant application of the MVRA.  Indeed, a defendant can be ordered to pay restitution for losses stemming from offenses other than those on which there was a conviction if the plea agreement specifically states that an offense covered under the MVRA gave rise to the plea.  *See* 18 U.S.C. §3663A(c)(2).  As the crime of fraud is one such crime for which restitution is rendered mandatory under the MVRA, and Defendants signed a plea agreement which allows for restitution and indicates counts of mail and wire fraud were dismissed in consideration of the Defendants's pleas, the Magistrate Judge concludes application of the MVRA is appropriate in the present case.  The VWPA also allows an order of restitution in any criminal case to the extent agreed to by parties in a plea agreement; thus, any of the crimes set forth in the plea agreement not listed under the MVRA are covered under the VWPA.  *See* 18 U.S.C. §3663(a)(3).[1]

"The law in this Circuit provides that once the district court has considered the required factors under the [restitution statutes], the court has very broad discretion in setting the terms of the restitution order."  *United States v. Lively*, 20 F.3d 193, 200 (6th Cir. 1994) (internal citations omitted).  Notwithstanding that observation, the primary and overarching purpose of the these statutes is, "to the extent possible, to make victims whole, to fully compensate victims for their losses, and to restore victims to their original state of well-being."  *United States v. Smith*, 297 F.

---

[1]Where the MVRA and VWPA do not differ in material ways in connection with issues raised by this recommendation, the Court will rely on case law interpreting one as well as the other.

Supp. 2d 69, 72 (D.D.C. 2003); *see also Lively*, 20 F.3d at 203; *United States v. Anglian*, 784 F.2d 765, 767 (6th Cir. 1986); *United States v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006); *United States v. Simmonds*, 235 F.3d 826, 831 (3d Cir. 2000); *United States v. Grissom*, 44 F.3d 1507, 1515 (10th Cir. 1995). Accordingly, a court's power to order restitution under the MVRA or VWPA is limited to actual loss. *See United States v. Gifford*, 90 F.3d 160, 163 (6th Cir. 1996); *United States v. Coriaty*, 300 F.3d 244, 252 (2d Cir. 2002); *Smith*, 297 F. Supp. 2d at 72.

## B. Burden of Proof

Disputes as to the proper amount of restitution under the MVRA and VWPA are resolved according to the preponderance of the evidence. *See* 18 U.S.C. §3664(e); *see also United States v. Swanson*, 394 F.3d 520, 526 (7th Cir. 2005); *United States v. Newnam*, 4 F.3d 987, 1993 WL 336096, *2 (4th Cir. Sept. 1, 1993) (Table). The burden is on the Government to prove by a preponderance of the evidence the amount of the loss sustained as a result of the offense. *See* 18 U.S.C. §3664(e); *see also United States v. Polichemi*, 219 F.3d 698, 714 (7th Cir. 2000); *United States v. Smith*, 156 F.3d 1046, 1058 (10th Cir. 1998); *United States v. Messner*, 107 F.3d 1448, 1455 (10th Cir. 1997). A defendant, on the other hand, bears the burden of demonstrating his financial resources, as well as his financial needs and those of his dependents. *See* 18 U.S.C. §3664(e).

Once the initial computation of the amount of restitution owed is made, the Court must account for any benefit received by the victim and subtract that amount from any award because the restitution statutes authorize restitution only for actual losses sustained by the victim. *See Gifford*, 90 F.3d at 163; *see also United States v. Guthrie*, 64 F.3d 1510, 1516 (10th Cir. 1995); *United States v. Mullins*, 971, F.2d 1138, 1147 (4th Cir. 1992); *United States v. Oren*, 893 F.2d 1057, 1066 (9th Cir. 1990). Thus, the value of the portion of property retained by, or returned to, the victims must be

determined and deducted from the restitution amount, as well as any compensation or benefit the victim has or is expected to receive for the same loss. *See* 18 U.S.C. §§3663(b)(1)(B), 3663A(b)(1)(B); *see also United States v. Scott*, 74 F.3d 107, 110 (6th Cir. 1996); *United States v. Johnston*, 199 F.3d 1015, 1023 (9th Cir. 1999); *United States v. Holley*, 23 F.3d 902, 915 (5th Cir. 1994); *Mullins*, 971 F.2d at 1147; *United States v. Soderling*, 970 F.2d 529, 535-36 (9th Cir. 1992); *United States v. Smith*, 944 F.2d 618, 625 (9th Cir. 1991); *United States v. Boswell*, 565 F.2d 1338, 1342-43 (5th Cir. 1978). Indeed, restitution does not allow victims to be paid twice or to be awarded a windfall. *See United States v. McDaniel*, 398 F.3d 540, 555 (6th Cir. 2005) ("the restitution statutes do not permit victims to obtain multiple recoveries for the same loss"); *see also Boccagna*, 450 F.3d at 115, 117; *United States v. Quillen*, 335 F.3d 219, 226 (3d Cir. 2003); *United States v. Shepard*, 269 F.3d 884, 888 (7th Cir. 2001); *United States v. Fore*, 169 F.3d 104, 110 (2d Cir. 1999); *United States v. Parsons*, 141 F.3d 386, 393 (1st Cir. 1998); *United States v. Menza*, 137 F.3d 533, 539 (7th Cir. 1998); *United States v. West Indies Trans., Inc.*, 127 F.3d 299, 315(3d Cir. 1997); *United States v. Manzer*, 69 F.3d 222, 230 (8th Cir. 1995); *Guthrie*, 64 F.3d at 1516; *United States v. Savoie*, 985 F.2d 612, 619 n. 9 (1st Cir. 1993); *Smith*, 297 F. Supp. 2d at 72; *United States v. Anderson*, 85 F. Supp. 2d 1084, 1103 (D. Kan. 1999). Courts have relied upon the language set forth in 18 U.S.C. §3664(e) in concluding that the determination of which party has the burden of establishing offset of these benefits is within the discretion of the district court. *See United States v. Crawford*, 169 F.3d 590, 593 n. 2 (9th Cir. 1999); *Parsons*, 141 F.3d at 393; *United States v. Sheinbaum*, 136 F.3d 443, 449 (5th Cir. 1998); *United States v. Johnson*, No. 00-40094-01-SAC, 2002 WL 1162415, *3-4 (D. Kan. April 23, 2002); *Anderson*, 85 F. Supp. 2d at 1101-02.

18 U.S.C. §3664(e) states in pertinent part: "The burden of demonstrating such other matters

as the court deems appropriate shall be upon the party designated by the court as justice requires."

Courts have based their decisions as to the burden of proving offset on who is in the best position

to come forward with evidence of any alleged benefits received by the victims:

> Logically, the burden of proving an offset should lie with the
> defendant.  The statute allocates the various burdens of proof among
> the parties who are best able to satisfy those burdens and who have
> the strongest incentive to litigate the particular issues involved.
> Having investigated the crime and wishing to provide as strong a
> deterrent as possible, the government is best suited to persuade the
> court as to the amount of loss caused by the offense.  On the other
> hand, the defendant is better positioned to proffer evidence about his
> own financial resources and needs, and his desire to lower his
> restitution order gives him the incentive to litigate such mitigating
> circumstances.  In a similar vein, the defendant should know the
> value of any compensation he has already provided to the victim in
> civil proceedings, so the burden should fall on him to argue for a
> reduction in his restitution order by that amount.

*Sheinbaum*, 136 F.3d at 449; *see also Johnson*, 2002 WL 1162415, at *4; *Anderson*, 85 F. Supp. 2d

at 1102.  The majority of courts addressing this conundrum have placed the burden on the defendant.

*See United States v. Ruff*, 420 F.3d 772, 776 (8th Cir. 2005); *United States v. Speaks*, 54 Fed. Appx.

796, 796 (5th Cir. Dec. 12, 2002); *United States v. Calbat*, 266 F.3d 358, 365 (5th Cir. 2001); *United

States v. Karam*, 201 F.3d 320, 326, 327 (4th Cir. 2000); *United States v. Prismantas*, 191 F.3d 462,

1999 WL 716587, *2 (Sept. 14, 1999)(Table); *Parsons*, 141 F.3d at 393; *Sheinbaum*, 136 F.3d at

449; *United States v. Mmahat*, 106 F.3d 89, 98 (5th Cir. 1997); *Newnam*, 1993 WL 336096, at *2;

*Johnson*, 2002 WL 1162415, at *4; *Anderson*, 85 F. Supp. 2d at 1102.

The Magistrate Judge, however, does not consider the *Sheinbaum* court's conclusion that a

defendant bears the burden of proving offset a blanket rule.  Indeed, at least one of the factors

considered by the *Sheinbaum* court, which the Magistrate Judge concludes are decidedly logical,

varies on a case by case basis.  Indeed, the facts in the present case are highly illustrative of the

variability of the *Sheinbaum* court's reasoning regarding the access to information addressing the value of any compensation or benefit a victim has received.  As is evident from the Magistrate Judge's analysis below, the property (*i.e.*, money) returned to Defendants's victims was provided by third parties who did not, and, as far as the Magistrate Judge is aware, were under no obligation to, notify Defendants as to the date or the amount of the payment sent to the investors.  Thus, concluding Defendants should bear the burden of proving offset because they had personal knowledge of the benefit received would be inappropriate in this case.  Indeed, it is possible that no one party in this case has easier access to the information necessary to establish an offset than any other.

However, though difficult, establishing an offset of the loss amount in the present case is not impossible.  Indeed, this information was not wholly unavailable to Defendants; it simply was not as easily accessible had they submitted the payments themselves.  And the fact remains that Defendants are the more motivated parties to proffer evidence that would lower the restitution amount.  Moreover, Defendants agreed to restitution in the plea agreement, thus, it was of their own will, and not that of the Court, that they are faced with the burden of proving a lower restitution amount than that alleged by the Government.  Indeed, the difficulty in proving these offset amounts was a risk they weighed and undertook in signing their current plea agreements.  The Court, therefore, concludes that "justice requires" the burden of establishing offset be placed on Defendants.

## II. ANALYSIS

### A.  ETS Payphones

#### 1.  Background

Defendants were independent insurance agents who commissioned the sale of ETS payphones to investors.  Upon purchasing the phone, the investor would then lease it back to ETS at an agreed rate of return, which was guaranteed at 14% per year.  The amount of the lease payments varied by the size of the investment and were purportedly made "religiously" by ETS until September 2000, when the company filed for bankruptcy.  Defendants had 332 individuals who invested in ETS payphones.

In September 2005, Charles Edwards, the CEO of ETS, was found guilty of wire fraud, money laundering and conspiracy to commit money laundering for willfully devising a scheme to defraud investors through the sale of these payphones.  Edwards was sentenced to 13 years imprisonment, 3 years supervised release and ordered to pay restitution to 10,662 victims in the amount of $320,397,837.

Similarly, Defendants are alleged to have misled investors into believing purchasing ETS payphones was a safe investment and that ETS was a highly profitable company.

#### 2.  Loss Amount and Deductions

The total investment amount of the 332 investors is largely undisputed.  Information provided by Defendant Prokop alleges an investment amount that is only $14,000 less than that alleged by the Government.[2]  Regardless of how small the sum, relatively speaking, the fact remains

---

[2]First, is a dispute as to an investor who the Government claims invested $7,000 in the ETS payphones.  Defendants contend this individual did not invest any money at all.  The Government, however, has provided sufficient proof of the money invested by this individual in

the Government bears the burden of proving the loss amount. 18 U.S.C. §3664(e). The Government has satisfied its burden regarding proving actual loss of $7,000 of the disputed $14,000. However, regarding the other $7,000, it has failed to offer any proof in support of its calculations as to this individual's investment amount. As such, it has failed to meet its burden regarding the alleged $9,895,046 calculation. The Magistrate Judge, therefore, sees no problem in using the total investment amount as calculated by Defendants, $9,888,046, as a starting point. The only remaining points of contention in this instance are: (1) the total amount of refunds received by investors and (2) whether the lease payments received by the investors should be deducted from their alleged losses.

Defendants contend that 21 investors received refunds from ETS which totaled $466,500. The Government concedes that over 20 investors received refunds and that the total of those refunds should be deducted from the loss amount. The Government, however, calculated the refund amount at $428,956. Defendants have offered nothing in support of their allegations regarding the refunds other than their own unsubstantiated conclusions, thus, nothing exists in the record which would contradict the Government's calculation of the refunds received. As such, the Magistrate Judge concludes the initial loss amount should be reduced by $428,956.

Defendants, next, assert that approximately $1,187,048 was made in distributions (*i.e.*, lease

---

a letter to Defendants and the Court, which Defendants have failed to challenge. As such, the Magistrate Judge has resolved the dispute in the Government's favor.

However, in addressing another dispute, Defendant contend another investor provided only $42,000 as an initial investment while the Government asserts the investment amount was $63,000. Although the difference between these figures is $21,000, Defendants have alleged a larger investment amount for another investor than that asserted by the Government. Defendant alleged this other individual invested $21,000, while the Government alleged an investment amount of only $7,000. Thus, the amount in genuine dispute totals only $7,000 and concerns only the investor whose investment amount was allegedly over estimated by the Government.

payments) to investors.  Defendants reached this number by estimating distributions received based on the payment schedule instituted by ETS.  Depending on the size of the investment, investors received a monthly check of $75, $80, or $82, beginning two months after the initial investment (at the latest), and all ending in September 2000.  Defendants contend this is an accurate manner in which to measure the amount of lease payments received because there was extensive testimony during the Edwards litigation regarding the schedule of payment and how the checks were sent out "religiously."  Defendants maintain this assertion went unchallenged by the Government during the initial prosecution.  Because the lease payments were distributed by ETS and Defendants have no records of these payments, the Magistrate Judge concludes Defendants reliance on the Edwards's trial testimony sufficiently satisfies their burden of proving offset.

Significantly, the Government does not challenge the amount of lease payments nor the conclusion that some investors received some payments.  Instead, it argues the payments should not be deducted from the loss calculation because of the negative tax consequences to the victims and Defendants's failure to prove all investors's receipt of these payments.  The Magistrate Judge, however, has already determined Defendants have satisfied their burden of proof and as the Government has failed to offer any evidence to the contrary, the Magistrate Judge sees no need to alter his determination.  The Magistrate Judge also finds no merit in the Government's argument that the lease payments should not be deducted from the restitution amount because of the tax consequences to the victims.  It has offered no case law in support of this contention and the Magistrate Judge was unable to locate any law suggesting tax consequences should be a consideration in measuring restitution. The Government has also failed to measure the loss to victims as a result of said consequences.  As such, the Magistrate Judge concludes the initial loss

amount should be reduced by $1,187,048. *See United States v. Shepard*, 269 F.3d 884, 888 (7th Cir. 2001) (defendants convicted of mail fraud and money laundering who drained their victim's bank account under the guise of performing household improvements, but then actually used a portion of that money from that account to improve the victim's home, were entitled to have the value of those improvements deducted from the restitution amount).

### 3. Restitution Amount

The Magistrate Judge recommends that the restitution amount for the ETS investors be the total investment amount ($9,888,046), less the total number of refunds ($428,956) and the total monthly payments received by investors ($1,187,048). Defendant, therefore, should be ordered to pay $8,272,042.

### B. **JED ATMs**

### 1. Background

Defendants acted as independent agents for JED[3] and sold ATMs on behalf of the company. Once the machines were sold, JED was responsible for managing them on behalf of the investors and distributing monthly checks to investors. These checks accounted for the transaction fees individuals were charged for using the machine. Thus, the size of the check was dependent on the level of machine usage. Upon purchasing an ATM machine, investors were given an option to resell the machine back to JED and receive their original investment amount back ($10,000 per machine), less a fee of $1,000, after the passage of a certain amount of time.

The Government alleged Defendants, among other things, misled the 51 investors they sold ATM machines to into believing this was a safe investment and that JED was a highly profitable

---

[3]JED is currently in receivership.

company.

## 2.  Loss Amount and Deductions

Again, the total investment amount of the 51 investors is largely undisputed. Indeed, the information provided by Defendant Prokop alleges an investment amount that is $10,000 more than that of the Government.  As such, the total investment amount as calculated by the Government, $855,000, will be used as a starting point.  The only points of contention in this instance are (1) the total amount of refunds received by investors and (2) whether the monthly distributions received by the investors should be deducted from their alleged losses.

The dispute regarding the amount of refunds received is a small one.  One machine was returned for a full refund of $10,000, but three machines were resold to JED rather than returned, so those individuals only received $9,000 back for the machine rather than the full $10,000. Defendants contend that because the $1,000 deduction for reselling was a part of the contract, the individuals who resold received what they bargained for and did not experience any loss.  According to Defendants, these investors should be credited as receiving the entire $10,000 per machine back. The Magistrate Judge finds it rather ironic that a Defendant accused of fraudulently inducing individuals to enter into a contract would have the audacity to then make the argument said individuals received that for which they bargained.  Needless to say, Defendants's argument is unpersuasive.  The three machines were resold for $9,000 each and were done so at a loss to the investors of a total of $3,000.  Consequently, the total refund amount that should be deducted is $37,000.

There is also the issue of the monthly checks received by investors for machine usage. Unlike with ETS payphones, Defendants are unable to provide an estimate as to the total amount of

-11-

money received by the ATM investors, let alone prove all the investors received those payments. They, nevertheless, seek a reduction in the restitution amount based on these distributions.  The Magistrate Judge concludes that the failure of Defendants to provide, at the very least, an estimate of the amount of money received by the investors, fails to create a legitimate dispute that would require the Court to reach a determination as to an offset amount.  *See Swanson*, 394 F.3d at 527 (a defendant's wholly unsubstantiated statements are not enough to counter or even question a court's acceptance of the government's proof of loss as outlined in the pre-sentence investigation report); *see also United States v. Ramsey*, 130 Fed. Appx. 821, 823 (7th Cir. May 9, 2005) (where the record contained no information regarding cars the defendant alleged were returned to victims, the court determined it had no basis on which to conclude the district court erred in ordering restitution that did not deduct the value of said cars).  Indeed, they have failed to meet their burden of establishing offset and so no reduction should be made to the restitution amount.

Defendants, however, have sufficiently alleged the receipt of $4811.31 by 2 of the 51 ATM investors.  Defendants have explained they calculated these numbers based on information submitted at the National Association of Securities Dealers ("NASD") arbitration against Defendant Prokop.  The Government, despite questioning these disbursements, has failed to offer any evidence to contradict Defendants's proffered source.  In fact, the Government has indicated that should its review of the information relied upon by Defendants indicate payment to these two victims, it would not dispute the offset of this amount.  The Magistrate Judge, therefore, concludes the initial loss amount should be reduced by $4811.31 absent any substantiated objection by the Government.

-12-

### 3.  Restitution Amount

The Magistrate Judge recommends that the restitution amount for the ATM investors be the total investment amount ($855,000), less the total number of refunds ($37,000) and the amount of monthly payments received by two investors ($4,811.31).  Defendant, therefore, should be ordered to pay $813,188.69.

### C.  **MBC Viaticals**

### 1.  Background

Defendants are alleged to have sold 196 individuals viatical contracts while acting as independent insurance agents on behalf of MBC.  Viatical contracts are the sale of a life insurance policy by a terminally ill person or senior citizen at a price discounted from the face value of the policy.  Investors pay the premiums and are *supposed* to receive the face value of the policy when the insured individual dies.  In turn, the insured individual receives a portion of the proceeds of his life insurance policy as a lump sum.

In May 2004, the SEC filed an emergency civil action against MBC and its principals, alleging that from late 1994 to the present, it had sold $1.067 billion in viatical settlements to more than 29,000 investors.  According to the SEC, MBC made material misrepresentations to investors and, in particular, failed to disclose that the life expectancy estimates assigned to a significant number of the policies were fraudulently assigned.  A receiver was appointed for MBC in relation to this SEC matter.

When MBC was assigned a receiver, investors were given three options regarding their viatical policies: (1) maintain the policies themselves by making the monthly payments until the policy matured; (2) have the receiver attempt to sell the policy to a third party; or (3) return the

-13-

policy to the receiver and receive a partial refund.  Because there typically is no single investor on

a policy but several (most of whom, the Magistrate Judge was lead to believe, are likely complete

strangers), the decision of what to do with the policy was left to the majority of investors on a single

policy who responded to the option letter.  If an investor was not a part of the majority, he was still

bound by the decision reached by his fellow investors.  Significantly, if the majority opted to

maintain the policy themselves and a single investor failed to make that payment, the policy would

lapse and none of the investors would receive any disbursement.

Both parties have acknowledged that it is unclear what distributions MBC investors would

receive in the future from the receiver.  Additionally, it has been reported to the Magistrate Judge

that when investors have opted to have the policy sold, the receiver was able to obtain a price of only

4 to 11 cents on the dollar.

## 2.  Loss Amount and Deductions

Initially, the Government alleged an investment amount of $5,668,399 for the 196 MBC

investors.  In records filed with the Court, Defendants contend the Government has over-calculated

this amount by $14,000.  The Government, in correspondence sent to both defense counsel and the

Court, listed what it considered to be discrepancies between its records and those of Defendants.

This $14,000 was not listed among the disputed figures and has not been addressed by the

Government in any manner.  The Magistrate Judge, consequently, concludes the Government has

failed to satisfy its burden regarding the $5,668,399 investment calculation it alleges.  The total

investment amount as calculated by Defendants, $5,654,399, will be used as a starting point.

Defendants have raised two issues regarding offset to the loss amount for the MBC investors.

They, however, have failed to provide sufficient evidence to satisfy their burden of proof.

-14-

Defendants, first, argue the restitution amount should be reduced to reflect the value of the viable viatical policies still held by some of the investors.  Nonetheless, they have failed to provide even an estimate of the value of these policies, let alone evidence of their actual value.  Indeed, the Court has not been provided with  even a list indicating which of the original 196 investors still have viable viatical policies.  The Magistrate Judge, nevertheless, recognizes the extreme difficulty of measuring this benefit.  As stated above, the money received by the investors was provided by a third party who did not, and was under no burden to, notify Defendants as to the date or the amount of the payment sent to the investors.  Thus, Defendants assertion that they have no knowledge nor any record of policies which matured or the amount of disbursements received by investors, is to be expected. Indeed, these facts render Defendants's failure, if not forgivable, at the very least understandable.[4]

Both sides acknowledge it is possible that some of the investors have retained viable viatical policies.  The Magistrate Judge finds this mutual acknowledgment to be of some significance as it is, in essence, an agreement that these investors have received some, as yet unmeasured, benefit.

 A main premise of the restitution statutes is that an order of restitution is limited to actual loss and should not amount to a windfall for the victim.  *Gifford*, 90 F.3d at 163; *Boccagna*, 450 F.3d at 115, 117.  Here, ordering restitution for the full investment amount paid by individuals who also hold a policy which will likely result in some monetary benefit to them, would result in a potential recovery beyond their actual loss.  Indeed, as neither side denies that these policies have some undetermined value, the Magistrate Judge concludes justice requires some reduction to the

_____

[4]Indeed, the Magistrate Judge, upon weighing this difficulty, believes it would be easier for the Government to obtain the information necessary to meet this burden as it, at the very least, has the ability to contact investors to determine whether their policies have matured and if they have received any disbursements.

-15-

restitution amount for the MBC investors is warranted.  This conclusion, thus, leaves the Court with the daunting task of calculating the value of the viatical policies at issue.

Both the VWPA and MVRA are silent as to how property returned to victims, such as the viatical policies here, is to be valued.  *See Boccagna*, 450 F.3d at 114.  The law, however, appears to allow "the exercise of discretion by the sentencing courts in determining the measure of value appropriate to restitution calculations in a given case.  *See id.* at 114-15; *see also* 18 U.S.C. §3664(f)(1)(A) (a "court shall order restitution to each victim in the full amount of each victim's losses *as determined by the court* and without consideration of the economic circumstances of the defendant") (emphasis added).  Consequently, the Magistrate Judge views the statutes's use of the term "value" as a "flexible concept to be calculated by a district court by the measure that best serves Congress's statutory purpose."  *Boccagna*, 450 F.3d at 115.

The first and most obvious manner in which to measure the value of the viaticals is by their face value.  Each investor was assured payment of a certain amount of money when the policy matured.  Although this constitutes a relatively effortless manner in which to measure the offset value, both sides seem to agree that this would be an inaccurate measure as both acknowledge these policies have lost value.[5]  Moreover, the Magistrate Judge is unsure if full payment of the expected disbursement at the time a policy has matured can be assumed since MBC is in receivership for an SEC civil action and the receiver has indicated investors will only receive a *pro rata* share of the

---

[5]Although an investor may have initially purchased the policy expecting a set dollar amount, even Defendants acknowledge the policy can no longer be considered worth that amount.  Moreover, there is an increased risk for those investors who chose to retain (or were forced to retain by the other investors on their policy) their policies, as a single missed payment by any one investor on a single policy would result in default and the policy would be of no worth at that point.

-16-

policy pay out (*See Restitution Memorandum of Behalf of John E. Prokop*, Exhibit B, p. 2).  Indeed,

even Defendants recognize that, "it is unclear what distributions investors will receive in the future."

Consequently, the face value of the viatical is not the most accurate measure of the value of the

policy.[6]

Fair market value is also another method in which the value of the viaticals can be assessed.

According to Defendants, the receiver has indicated he has been reselling viaticals on behalf of

investors to third parties for 4 to 11 cents on the dollar.  The Magistrate Judge, however, does not

consider this a true measure of the policies's fair market value and believes it undervalues them.

Indeed, a policy sold by a receiver in a must-sell situation is not a reflection of an arm's-length

---

[6]To the extent investors received interest in the viatical policies, at least some of the funds they submitted to Defendants could be considered "returned" for statutory purposes. *Shepard*, 269 F.3d at 887-88.  Indeed, other courts have determined that the mere fact the return property was in a different form that what the victim initially provided is of little significance. *See id.*; *Holley*, 23 F.3d at 915.  Indeed, "[i]t is no different in principle from taking the money from one of [the victim's] bank accounts and depositing it in another a week later."  *Id.*  So long as the victim has received a benefit from the property, it has been, at the very least, partially "returned."  *See id.* at 888; *but see United States v. Angelica*, 859 F.2d 1390, 1394 (9th Cir. 1988)(holding the district court did not abuse it discretion in disregarding "substitute" property as it did not constitute "returned" property as set forth in the VWPA.)

That being said, the Magistrate Judge recognizes both restitution statutes require the value of property returned to be measured as of the date of its return.  18 U.S.C. §§3663(b)(1)(B), 3663A(b)(1)(B).  Thus, in strictly abiding by this language, the proper measure of the policy values in this case would be the value at the time the investors received it, which would likely be the face value of the viatical.  This, however, may result in an inaccurate assessment which would underestimate the loss suffered by the investors.  Nevertheless, some courts have concluded that any reduction in value in the returned property stems from the decision by the victim to hold onto said property and to make a defendant pay restitution for that loss is improper.  *See Smith*, 944 F.2d at 625.  That reasoning, however, does not apply in the present case where investors were allegedly, fraudulently induced into purchasing said property.

The goal of the MVRA and VWPA is to make the victim whole.  The Magistrate Judge concludes this primary and overarching purpose renders the need to measure the value of property returned, as set forth in the statutes, secondary.  Thus, because measuring the value of the policies as of the date returned would not fully compensate the investors for their losses, it would be an inappropriate measure of value.

transaction in the open market, which is normally associated with determining fair market value. *See Boccagna*, 450 F.3d at 115; *see also Black's Law Dictionary*, p. 1587 (8th ed. 2004).  Moreover, the Magistrate Judge considers a sale price of 4 to 11 cents on the dollar to be nominal, and not a true reflection of the disbursement the inventors will receive when their policies mature.  Indeed, using this nominal price to calculate offset value would result in restitution in an amount in excess of the victims's loss, which is not permitted under the restitution statutes.  Regardless, the fact that the there is no evidence in the record of how many of the investors still have policies that are viable policies renders the use of this measure of calculation pointless.

Because the value of these viatical policies is decidedly difficult to measure, and neither side has provided the Court with any evidence that would render the task any less complicated, the Magistrate Judge concludes a more unorthodox method is required for determining the restitution amount.  Indeed, the viaticals, rather than being treated as something of value, should be treated as a promise of future payment from the receiver.  This manner of calculation allows for an accurate measure of the actual benefit received by the victims and protects Defendants from paying beyond their actual loss.

Thus, the Magistrate Judge recommends Defendants be ordered to pay a restitution amount that includes the total investment amounts of all MBC investors and that money be placed in escrow/trust.  Investors who no longer have viable policies may receive their restitution amount if they provide an affidavit indicating: (1) their policy number; (2) that they no longer have a viable viatical policy; (3) the amount of money received from disbursements from any MBC viatical policy; and (4) the amount of money they received from the receiver not related to expected disbursements from a policy (*e.g.*, money from the sale of the viatical).  If no disbursements or

money from the receiver were provided, that investor is entitled to restitution in the amount of his/her entire investment.  If any disbursements or payments were received by the investor, he/she is entitled to a restitution amount of his/her investment less any disbursements from the policy and/or any money from the receiver.  Any investor who still has a viable viatical must wait until either the policy has matured or they no longer have an interest in the policy.  Upon providing an affidavit as described above they, too, will be entitled to a restitution amount of the investment less any disbursements from the policy and/or any money from the receiver, if any.[7]

Second, Defendants argue the restitution amount should be reduced to reflect disbursements made to investors whose policies have already matured.  They have failed, however, to provide any evidence regarding these disbursements other than informing the Magistrate Judge they were made aware of these payments by the investors themselves, who purportedly informed Defendant Prokop of the disbursements when they occurred.  This, obviously, is insufficient to establish offset.  Moreover, the disbursement plan explained above addresses the issue of any investors who have already received disbursements for matured policies.  Thus, there is no danger of double payment to these victims.

### 3.  Restitution Amount

The Magistrate Judge recommends the restitution amount for the MBC investors be the total investment amount ($5,654,399) to be placed in escrow/trust.  Upon providing an affidavit indicating (1) their policy number; (2) that they no longer have a viable viatical policy; (3) the amount of money received from disbursements from any MBC viatical policy; and (4) the amount

---

[7]For a similar restitution disbursement plan, *see United States v. Boswell*, 565 F.2d 1338, 1342-43 (5th Cir. 1978), *receded from on other grounds by Sockwell v. Phelps*, 906 F.2d 1096, 1098 (5th Cir. 1990).

of money they received from the receiver not related to expected disbursements from a policy (*e.g.*, money from the sale of the viatical), the investors will be entitled to their entire investment amount or their investment amount less any disbursements from the policy and/or any money from the receiver set forth in their affidavits.[8] Thus, as of the August 23, 2006 restitution hearing, Defendants should be ordered to pay $5,654,399.[9]

### D.  ABS Viaticals

#### 1.  Background

Defendants are alleged to have sold 19 individuals viatical contracts through ABS.  In purchasing the policies, investors were given the option of electing to receive all of the money when the policy matured, or disbursements over the course of 36 months with a lump sum payment when the policy matured.  However, although over $115 million in investor funds were collected through ABS, only a small portion of that money was actually used to purchase viatical policies.  Thus, in some instances, Defendants purportedly were selling policies to investors which did not exist.

An involuntary bankruptcy petition was filed against Financial Federated Title and Trust, Inc. ("FinFed"), and a number of companies, including ABS, were determined to be alter egos of FinFed or were consolidated into the bankruptcy case. A plan administrator was appointed for ABS's bankruptcy case and a restitution receiver for the criminal case.  The last update provided by

---

[8]Because the Magistrate Judge has concluded Defendants would be entitled to a deduction for any disbursements from a mature policy and/or any money from the receiver that has already been provided had they proven the investors actually received this money, the Court should consider providing them with a time period to allow them the opportunity to provide the necessary evidence to establish offset. *Cf.* 18 U.S.C. §3664(d)(5).

[9]In the present case, the parties acknowledge the existence of a well-established MBC receiver.  Under the circumstances, the Magistrate Judge anticipates that said receiver will be a potential source of credible information who can assist in the execution of this recommendation.

-20-

the receiver was sent on December 2002 to an undisclosed number of investors.  (*See Restitution Memorandum of Behalf of John E. Prokop*, Exhibit C).  This letter indicated the receiver had distributed a total return of 16.5074% to nonbroker investors who filed timely proofs of claim and had not assigned their bankruptcy claims (*See Restitution Memorandum of Behalf of John E. Prokop*, Exhibit C, p. 2).  He further stated he eventually hoped to distribute a return of up to 20% for these victims once the appeals had ended (*See Restitution Memorandum of Behalf of John E. Prokop*, Exhibit C, p. 2).  Notably, none of the ABS investors have retained their policies; they are all in the hands of the receiver or have been sold by the receiver.

### 2.  Loss Amounts and Deductions

There is a rather significant dispute as to the total investment amount of the 19 ABS investors.  Defendants allege an investment amount of $617,000, while the Government contends the ABS investors's loss totaled $762,000.  The $145,000 difference in calculations involves three different investors.  The Government, nonetheless, has provided evidence to support the investment amount attributed to these investors and Defendants have failed to rebut it.  The Government, therefore, has met its burden and the Magistrate Judge will use its $762,000 loss calculation as a starting point.

Fortunately, unlike with the MBC viaticals, the value of the ABS policies are not an issue here because none of them were retained by the investors.  According to Defendants, however, a reduction should be made in the restitution amount as the receiver has issued a statement indicating he has distributed 16.5074% of ABS's funds to nonbroker claimants who filed timely proofs of claim and had not assigned their bankruptcy claims.  According to Defendants, as a result of this statement, 16.5074% should be deducted from the total loss amount in the present case.  Other than

providing this rather general statement by the receiver, however, Defendants have failed to prove that the 19 investors at issue here received any of this money. Admittedly, the receiver's letter seems to suggest the 16.5074% was distributed evenly amongst ABS investors who "filed timely proofs of claim," but nothing has been offered to indicate that the 19 investors were amongst those who filed timely proofs of claim (*See Restitution Memorandum of Behalf of John E. Prokop*, Exhibit C, p. 8).[10]

The Magistrate Judge recognizes that a defendant should be given credit for funds in the hands of a receiver that will eventually be distributed to investors. *See Boswell*, 565 F.2d at 1342-43. Nevertheless, as they have failed to proffer any evidence that any of their investors received a 16.5074% return of their investment, Defendants have failed to meet their burden for offset. However, because neither side denies that the receiver is making disbursements to some, if not all, ABS investors and the Magistrate Judge recognizes the difficulty on the part of Defendants in obtaining information regarding disbursements made by the receiver, the Magistrate Judge recommends a similar disbursement plan to that regarding MBC investors to avoid double recovery.[11] Specifically, it is recommended that Defendants be ordered to pay a restitution amount

_____

[10]If these investors have, in fact, failed to file timely proofs of claim with the receiver, it shall not be held against them. Indeed, the restitution statutes do not require a district court to offset losses by amounts that could have been avoided through proper mitigation on the part of the victims. *See Grissom*, 44 F.3d at 1515, *citing Soderling*, 970 F.2d at 534 n. 10; *Newnam*, 1993 WL 336096, at *3.

[11]Defendants have provided the names of two sets of ABS investors who they allege received disbursements of $9,890.26 and $10,394.79. Their knowledge of these payments, however, is based on the investors purportedly informing Defendant Prokop of the disbursement. This, as stated above, is insufficient to establish offset. Defendants, however, have asserted that paperwork or testimony in the NASD arbitration against Defendant Prokop supports the disbursement of $9,890.26 to one of the investors. This evidence has not been submitted to the Court, but Defendants have agreed to provide said information to the Government. At this stage,

that includes the total investment amounts of all 19 ABS investors and that money be placed in escrow/trust.  Investors must then provide an affidavit indicating: (1) the amount of money they received from disbursements from any ABS viatical policy; (2) the amount of money they received from the receiver not related to expected disbursements from a policy; and (3) an assurance that should they receive any future payments from the ABS receiver, they will notify the appropriate federal agency maintaining the escrow account.  If no disbursements or money from the receiver were provided, that investor would be entitled to restitution in the amount of his/her entire investment.  If any disbursements or payments were received by the investor, he/she would be entitled to a restitution amount of his/her investment less any disbursements from the policy and/or any money from the receiver.[12]  Any future disbursements from the receiver must be deducted from all restitution distributions, as well.

### 3. Restitution Amount

The Magistrate Judge recommends that the restitution amount for the ABS investors be the total investment amount ($762,000) to be placed in escrow/trust.  Upon providing an affidavit indicating (1) the amount of money they received from disbursements from any ABS viatical policy; (2) the amount of money they received from the receiver not related to expected disbursements from

---

the Magistrate Judge thinks it unnecessary to consider the persuasiveness of this evidence based on the distribution plan set forth below.

[12]The Government has agreed to contact the Clerk's Office in the district in which the receiver is located in an attempt to determine if any payments have been sent to the 19 investors at issue in the present case.  If the Government becomes aware of any such payments, that amount shall be offset from the loss amount as calculated by the Government.  Because the receiver indicated future payments were expected, however, all ABS investors, even those the Government manages to determine received some disbursement, must provide an affidavit to collect their restitution.

a policy; and (3) an assurance that should they receive any future payments from the ABS receiver, they will notify the appropriate federal agency maintaining the escrow account, the investors will be entitled to their entire investment amount or their investment amount less any disbursements from the policy and/or any money from the receiver set forth in their affidavits.[13] Additionally, any future disbursements from the receiver must be deducted from all restitution distributions. Thus, as of the August 23, 2006 restitution hearing, Defendants should be ordered to pay $762,000.

## III. CONCLUSION

Determination of "a restitution award is 'by nature an inexact science,'" thus, the loss calculation need not be precise. *Grissom*, 44 F.3d at 1514-15, *quoting United States v. Teehee*, 893 F.2d 271, 274 (10th Cir. 1990). This is an extremely complicated case involving very little information and an uncomfortable number of contingencies. Nevertheless, the Magistrate Judge concludes that the total amount of restitution owed in this matter is $15,501,629.69, less (1) any disbursements from an MBC and/or ABS viatical policy and/or any money from an MBC and/or ABS receiver; and (2) any future disbursements by the ABS receiver.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date: August 11, 2006

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of mailing of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474

---

[13]As with the MBC policies, the Court should consider providing Defendants with a time period to allow them the opportunity to provide the necessary evidence regarding ABS distributions to establish offset. *Cf.* 18 U.S.C. §3664(d)(5).

U.S. 140 (1985); *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).